# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| MICHAEL KELLEY, | : | Case No. 3:16-cv-393 |
| Plaintiff, | : | Magistrate Judge Sharon L. Ovington |
| | : | (by consent of the parties) |
| vs. | : | |
| NANCY A. BERRYHILL, Commissioner Of The Social Security Administration, | : | |
| Defendant. | : | |

# DECISION AND ENTRY

## I.

Plaintiff Michael Kelly brings this case challenging the Social Security Administration's denial of his applications for Supplemental Security Income and Disability Insurance Benefits. He applied for benefits under both programs in August 2013 asserting that he was under a disability, beginning on July 15, 2012. He suffers from significant pain in his back and shoulders among other health problems. An Administrative Law Judge (ALJ), George D. McHugh, concluded that Plaintiff was not under a disability and, consequently, denied his applications.

Plaintiff contends here that the ALJ McHugh erred in rejecting the opinions of his treating physician, Dr. Ferguson, and by inadequately weighing the opinions of record-reviewing physicians.

The Commissioner finds no error in the ALJ's decision and contends that substantial evidence supports the ALJ's findings.

## II.

On the date Plaintiff's alleged disability began, he was fifty-one years old. He was therefore considered a "person closely approaching advanced age" under social security law. 20 C.F.R. § 404.1563(d).[1] Plaintiff's counsel points out that Plaintiff turned age 55 in late 2015. At that point, he became a "person of advanced age" under social security law. *Id*. at § 404.1563(e). He has a high-school education and worked over the years as a Machine Maintenance Mechanic.

Plaintiff testified at the hearing before ALJ McHugh that his worst pain is in his lower back, extending down to his tailbone, and in his left shoulder. His pain has been longstanding. He experienced it before his asserted disability onset date. Working makes his pain worse. On a one to ten scale, Plaintiff estimated that his pain was at level eight. He takes Oxycodone every day to treat his pain.

Plaintiff had surgery on his left shoulder, but it was not successful. After surgery he was told that "it had been torn so long that the muscle is shriveled up, and it couldn't be repaired, that I was looking at shoulder replacement." (Doc. #7, *PageID* # 1994).

Plaintiff attempts to relieve his pain by reclining and sometimes placing an ice bag. This relieves "some" of his pain. *Id*. at 1995. He spends most, three quarters, of the day lying in the recliner. *Id*. at 2007.

Plaintiff has trouble twisting at his waist and bending. He can wash dishes, which

---

[1] Citations social-security regulations are to those concerning Disability Insurance Benefits with full consideration of the corresponding regulations concerning Supplemental Security Income.

involves some bending, for about 15 minutes before he needs to sit.  Both sitting and standing hurt after a while, and he needs to change position to reduce the pain.  When he lies in bed, the combination of his shoulder and back pain makes it very difficult for him to get out of bed.  He tries to walk at least once a day but just to the corner (presumably near his house).

During a typical day for Plaintiff, he wakes up and takes his pain medication.  His son, his daughter, and his sister keep his house straightened up.  When he tries to do some housecleaning but, after 30 minutes, he must stop and sit for a few hours.  *Id*. at 2008.  He uses a seat when he takes a shower.  His son goes grocery shopping for him.  He sometimes accompanies his son to the store but waits in the truck because he doesn't want to be around people.  He doesn't cook a lot but washes the dishes "a little bit."  *Id*. at 2002.  He does not vacuum, mow his lawn, attend church, or socialize.

Plaintiff also struggles with depression marked by crying spells, poor sleep, and difficulty concentrating.  *Id*. at 1995-96.  His anxiety causes further problems.  His heart will race and he will cry uncontrollably.  Plaintiff's children help him "quite a bit."  *Id*. at 1981.

Plaintiff testified that he attempted to work starting around December 2012.  He explained, "luckily, a few of the places … called me, and I'd go work on their machines when they couldn't figure out the problem, and get them going."  *Id*. at 1984.  But, he was "really hurting" at the time.  *Id*.  He testified, "I explained to the people that I went to work for that there w[ere] some things that I wasn't going to be able to do, and they did get people to help me for a little while, but they said that, you know, they couldn't keep, you know—

3

they just quit calling me." *Id*. at 1984-85. Plaintiff earned minimal amounts performing this work. *Id*. at 2005.

### III.

Plaintiff's treating primary care physician is Dr. Ferguson. *See id*. at 2342-66, 2455-84, 2646-744. Plaintiff frequently reported to Dr. Ferguson that he was experiencing anxiety, depression, and/or back and bilateral shoulder pain. *See id*.
In April 2013, Plaintiff reported that his left shoulder hurt more than his right, that he had been hurting for a long time, and that his pain had worsened over time. *Id*. at 2469. Dr. Ferguson often treated Plaintiff's pain with Percocet and Oxycodone. *Id*. at 2342-66, 2455-84. At times, Plaintiff asked Dr. Ferguson to increase his pain medication due increases in his pain. *Id*. at 2668, 2706.

In July 2011, Plaintiff reported to the emergency room with complaints of back pain which began after jumping out of a large machine while at work. *Id*. at 2403-04. Dr. Ferguson referred Plaintiff to Dr. Woods, an orthopedist. *Id*. at 2372. Dr. Woods treated Plaintiff from August 2011 through May 2012. *Id.* at 2372-88, 2418-49. He reported moderate to severe low-back pain that was aggravated by standing
and radiated into his lower extremities. *See id*. at 2372, 2378, 2379, 2383, 2386. He once said that the pain was "driving him crazy" and not improving with treatment. *Id*. at 2379.

Dr. Woods performed examinations that revealed abnormalities including painful range of motion and paraspinal tenderness. *Id*. at 2374, 2376, 2381, 2384, 2387. He also ordered a lumbar MRI that revealed Plaintiff had multiple significant abnormalities. *Id*. at

4

2450-51.  Dr. Woods diagnosed Plaintiff with a herniated lumbar disc, lumbar stenosis, and spinal fractures. *Id*. at 2381.

In August 2013, imaging ordered by Dr. Ferguson, imaging of Plaintiff's thoracic spine revealed evidence of remote T4 and T6 compression fractures, loss of disc space height at both vertebrae. *Id*. at 2487-88.  In late 2014, Plaintiff began receiving treatment for his anxiety and depression through Samaritan Behavioral Health. *Id*. at 2619-45.  He was observably uncomfortable while at the facility.  He was also tearful and demonstrated mental-status abnormalities. *Id*. at 2621, 2626.  His diagnoses included anxiety and depressive disorders. *Id*. at 2640.

Plaintiff returned to Dr. Woods's office in 2015 and Dr. Krepps treated began treating him. *Id*. at 2746-63.  He again endorsed significant bilateral shoulder pain, radiating into his arms and worse on his left side. *Id*. at 2747, 2751.  His range of motion was painful and he had palpable tenderness. *Id.* at 2749.  In February 2015, imaging revealed multiple abnormalities in both shoulders. *Id*. at 2762.  He underwent left shoulder surgery in April 2015 but continued to have pain after surgery. *Id*. at 2758.

\* \* \*

In January 2012, one-time consulting psychologist saw Plaintiff at the request of the state agency.  During the exam, Plaintiff sat with a stiff posture and avoided eye contact. *Id*. at 2397.  Dr. Halmi described him as appearing restless, fidgety, and "physically uncomfortable." *Id*.  Plaintiff's affect was flat and he manifested signs of anxiety. *Id*.  Dr. Halmi diagnosed Plaintiff with a depressive disorder. *Id*. at 2398.

5

Dr. Halmi's opinions about Plaintiff's functional limitations included the following: "Overall, I opine that he would have difficulty maintaining attention, concentration, persistence, and pace to complete simple, repetitive tasks due to psychological factors, most likely a combination of depression and anxiety…," *id*. at 2401; and, "He may have trouble meeting deadlines due to a lack of initiative and motivation secondary to being depressed." *Id*.

In November 2013, consulting psychologist Dr. Chiappone examined Plaintiff. He observed that Plaintiff walked and moved slowly. *Id*. at 2492. Plaintiff appeared depressed and reported symptoms of anxiety and depression. *Id*. at 2493. Dr. Chiappone diagnosed Plaintiff with a mood disorder and identified that follow functional limitations: "Mr. Kelley would have some difficulty remembering information over time…," *id*. at 2496; "Mr. Kelley would have some difficulty maintaining attention and concentration over time…," *id*. at 2495; and, "Mr. Kelley would have some difficulty dealing with job stress." *Id*.

On August 29, 2014, treating physician Dr. Ferguson responded to interrogatories regarding Plaintiff's physical and mental impairments and their resulting limitations. He outlined Plaintiff's symptoms, medical history, examination findings, diagnoses, and course of treatment. *Id*. at 2617. He opined that Plaintiff is unable to stand for longer than fifteen minutes at a time, can lift only five pounds, and can never stoop, balance, or bend as a part of occupational activity. *Id*. Dr. Ferguson also restricted Plaintiff to occasional bilateral manipulation. *Id*. at 2617-18. He also confirmed Plaintiff's need to frequently elevate his legs at or above his waist and opined that Plaintiff could engage in

work activity for two hours per day. *Id.* Lastly, Dr. Ferguson opined that Plaintiff suffers from mental impairments that would "markedly limit" his ability to withstand the stress and pressure of ordinary work activity and that his impairments would be expected to take him off-task for more than twenty percent of a typical work day. *Id.* at 2618.

## IV.

Plaintiff's eligibility to receive Disability Insurance Benefit and Supplemental Security hinged on whether he was under a "disability" as defined under social security law. *See* 42 U.S.C. §§ 423(d)(1)(A)-(d)(2)(A), 1381a; *see also Bowen v. City of New York*, 476 U.S. 467, 470 (1986). To determine if he was under such a disability, ALJ McHugh evaluated the evidence under the Social Security Administration's 5-step evaluation procedure. 20 C.F.R. §§ 404.1520(a)(4). Moving through step 1, the ALJ found at steps 2 and 3 that Plaintiff's impairments—including his severe impairments of "bilateral chronic shoulder pain with rotator cuff tears and residuals from surgery; degenerative disc disease of the lumbar spine; and affective disorders…."— did not automatically entitle him to benefits. (Doc. #7, *PageID* #s 1416-19).

At step 4, the ALJ found that the most Plaintiff could do despite his impairments— his residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)—was light work with fifteen enumerated limitations, including, for example, "(1) lifting and carrying up to 20 pounds occasionally, and up to 10 pounds frequently, (2) walking or standing with normal breaks up to 6 hours, [and] (3) sitting up to 6 hours…, (15) in addition to normal breaks, off-task up to 15% of the workday…." (Doc. #7, *PageID* # 1419).

7

ALJ McHugh found at steps four and five that Plaintiff could no longer perform his past work as a Machine Maintenance Mechanic but could perform a significant number of available jobs such as ticket seller, parking-lot cashier, and packager. *Id*. at 1426-27. This led ALJ McHugh to conclude, in the end, that Plaintiff was not under a disability and not entitled to benefits. *Id*.

V.

The present review of ALJ McHugh's decision determines whether he applied the correct legal standards and whether substantial evidence supports his findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). If he failed to apply the correct legal criteria, his decision may be fatally flawed even if the record contains substantial evidence supporting his findings. *Rabbers*, 582 F.3d at 651; *see Bowen*, 478 F.3d at 746; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004). Substantial evidence supports a finding when "a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance ...." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

As noted at the outset, Plaintiff challenges the ALJ's rejection of the opinions provided by his treating physician Dr. Ferguson. He argues that the ALJ erred, in part, by not providing good reasons for rejecting Dr. Ferguson's opinions. And he maintains that

8

Dr. Ferguson's opinions are substantively unopposed by any contrary examining or treating physician evidence.

The Commissioner contends that the ALJ reasonably placed little weight on Dr. Ferguson's opinions, including his opinion that Plaintiff was "unemployable." The Commissioner further contends that the ALJ's decision need not contain an item-by-item analysis of the regulatory factors applicable Dr. Ferguson's opinion but only needs to provide "good reasons" for finding his opinions worthy of "little weight." And, the ALJ's decision must be read as a whole, the result of which demonstrates that he provided "good reasons" as the regulations require, according to the Commissioner.

Socials Security law requires an ALJ to weigh a treating physician's opinion under the so-called treating physician rule. The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citation omitted); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014); 20 C.F.R. § 404.1527(c)(2).

If the treating physician's opinion is not controlling, the ALJ must continue to weigh the treating physician's opinions under "a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

ALJs must provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id*.

The ALJ placed little weight on Dr. Ferguson's opinions and provided several reasons for doing so. He first observed, "the conclusion of treating physician Dr. Ferguson that Plaintiff is 'unemployable' cannot be given controlling, or even deferential, weight. Such conclusion is neither well supported by medically acceptable clinical and diagnostic techniques nor consistent with other substantial evidence in the case record. Dr. Ferguson's conclusions are not consistent with the medical evidence of record, the objective findings, and the claimant's own testimony…." (Doc. #6, *PageID* #1425). The ALJ then advanced the following reasons to support his conclusions: (1) Plaintiff's "medications have been helpful in controlling his pain"; (2) he had not been hospitalized due to any of his impairments; (3) he continued to work after his alleged disability onset date, including driving to the Cleveland area, and he testified that he stopped doing such work after he lost his driver's license because it was no longer economically feasible; and (4) his depression went untreated for several years, and it wasn't until 2014 that he was evaluated and prescribed medication. *Id*.

Substantial evidence does not support the ALJ's reasoning. First, although Plaintiff told Dr. Ferguson that his "pain medication has been helping," (Doc. #6, *PageID* # 2459),

10

Dr. Ferguson's treatment records do not indicate that medications was "controlling" Plaintiff's pain. Indeed, one month after he told Dr. Ferguson that pain medication was helping, he reported that he was "having a lot of left side pain and back pain." *Id*. at 2455. He had pain in between his shoulder blades and into the left side of his chest, depending on how he sits. *Id*. Dr. Ferguson's examination revealed "abnormal joints" and limited range of motion. *Id*. at 2457. He diagnosed Plaintiff as having shoulder pain and pain in Plaintiff's thoracic spine. *Id*. Plaintiff often informed Dr. Ferguson that he was in pain and examinations showed tenderness and/or limited range of motion. *E.g., id*., at 2649, 2651-52, 2654-55, 2657-58, 2665-66, 2668, 2673-75, 2677. In January 2014, Plaintiff told Dr. Ferguson that his pain medication "has been helping the best it can." *Id*. at 2678. Nothing in these or other records provided by Dr. Ferguson provide a reasonable basis for finding that medication was "controlling" Plaintiff's pain or otherwise indicating that the help Plaintiff gained from pain medication was inconsistent with Dr. Ferguson's opinions about Plaintiff's work limitations.

Second, the ALJ's indication that Plaintiff has not been hospitalized is strawman reasoning. It sets the strawman—hospitalization—as a metric, then diminishes Dr. Ferguson's opinions based on its absence. Such reasoning provides little insight into the validity of Dr. Ferguson's opinions about Plaintiff's work limitations or the daily pain Plaintiff experiences. While a hospitalization might have helped confirm Plaintiff's pain levels, the fact remains that he could have still been in serious pain—and was by Dr. Ferguson's records and opinions—even though he was not hospitalized. Consequently,

11

absence of hospitalizations is not a reasonable basis for discounting Dr. Ferguson's opinions.

Third, the ALJ's reliance on Plaintiff's testimony about his continuing effort to work after his disability onset date is based on a mischaracterization of Plaintiff's testimony and is not a reasonable ground for rejecting Dr. Ferguson's opinions. Plaintiff testified that he went to Cleveland probably twice for a couple of hours to fix a "simple problem that their maintenance people just kind of overlooked." *Id*. at 2004. He only worked "a couple of hours" to fix this problem. *Id*. And, he explained, "I was always wore out. It didn't take much to—it just seemed like my shoulders and back just kept getting worse…." *Id*. This limited amount of work accompanied by his increasing pain levels is consistent with Dr. Ferguson's opinions about Plaintiff's limited work abilities. *Cf. Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (claimant's testimony that she occasionally worked a six-hour day "is a far cry from full-time work day-in and day-out."); cf. *also White v. Comm'r of Soc. Sec*., 312 F. App'x 779, 789 (6th Cir. 2009) ("White's extensive work history and attempts to continue working despite his disability support his credibility, a factor not even considered by the ALJ.").

Fourth, the ALJ's reliance on the facts that Plaintiff's depression went untreated for several years and was not diagnosed or treated with prescribed medication until 2014 is not a reasonable basis for discounting Dr. Ferguson's opinions about Plaintiff's physical work limitations. The ALJ, moreover, failed to consider why Plaintiff may not have sought and obtained treatment for depression before 2014, a necessity given his reliance on workers compensation and his "self-pay" status. *E.g.,* Doc. #6, *PageID* #s 2646, 2649, 2658; *cf.*

12

*Pierce*, 739 F.3d at 1050 (ALJ erred by failing to consider "an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin.").

Lastly, the ALJ's finding that Dr. Ferguson believed Plaintiff to be "unemployable" is incorrect; Dr. Ferguson's opinions do not state that Plaintiff was "unemployable." (Doc. #6, *PageID* #s 2617-18). The fact that the ALJ used quotation marks around the word "unemployable" tends to indicate that he thought he was quoting directly from Dr. Ferguson's opinion, even though he did not provide a supporting citation. If so, the inaccuracy does not inspire confidence in the ALJ's review of Plaintiff's medical records.

Additionally, quotation marks around the word "unemployable" frequently appear in ALJs' non-disability decisions. This suggests that it is boilerplate, particularly when it is used in reference to a treating source's opinions without citation. Because quoting "unemployable" in the present case was incorrect, it tends to suggest that ALJ McHugh used a boilerplate reference rather than meaningfully weighing Dr. Ferguson's opinions. At best for the Commissioner, ALJ McHugh intended his use of the word "unemployable" to mean "so-called-but-not really…." Garner, Bryan A., Garner's Modern English Usage 751, ¶N (4th ed. 2016). Garner provides an example: if he's a "champion," he certainly doesn't act like one. *Id*. Or, in the present case, "if Dr. Ferguson thinks Plaintiff is 'unemployable,' his opinion is unreliable." If this is what the ALJ meant, or if he meant something else, he should have simply said so rather than falling back on an inaccurate boilerplate reference.

The Commissioner suggests that the ALJ's use of the "unemployable" was consistent with the limitations Dr. Ferguson identified in his report, such as his opinion that Plaintiff

13

could only work two hours a day—a work preclusive limitation. The Commissioner also points out that in August 2013, Dr. Ferguson wrote in his treatment notes that Plaintiff was "'unable to work.'" (Doc. #13, *PageID* #2792, n.3) (citing *PageID* #s 1423, 2458). This, however, overlooks the boilerplate quality in the ALJ's incorrect use of quotation marks around the word "unemployable" and its attendant suggestion of an indolent review of Dr. Ferguson's report. Dr. Ferguson, moreover, provides a function-by-function breakdown of Plaintiff's capabilities that actually indicates an ability to perform some work activity, albeit on a part-time and restricted basis.

The absence of specific citation and explanation to support the ALJ's generalized allegations regarding lack of support or inconsistency was a significant omission in the present case, considering that the evidentiary record appears to substantiate Dr. Ferguson's conclusions. This includes the results of objective medical testing that revealed significant problems reasonably consistent with, and supportive of, Dr. Ferguson's assessment. *See* Doc. #6, *PageID* #s 2450-51, 2487, 2501, 2762.

Turning to the ALJ's reliance on opinions provided by record-reviewing physicians Drs. McKee and Villanueva, the ALJ gave his opinions great weight "as they are consistent with the medical evidence." *Id*. at 1421. This single conclusion fails to indicate that the ALJ weighed the opinions of these record reviewers as the regulations require. Instead, the ALJ erred by subjecting Dr. Ferguson's treating-source opinions to more rigorous scrutiny than he applied to Dr. McKee's or Dr. Villanueva's opinions. "A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the

14

inverse of the analysis that the regulation requires." *Gayheart*, 710 F.3d at 379 (citations omitted).

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[2]

## VI.

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own Regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

---

[2] In light of the above review and the resulting need for remand of this case, analysis of the parties' remaining arguments is unwarranted.

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, an ALJ should be directed to evaluate the evidence of record, including Dr. Ferguson's opinions and the other evidence of record, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings, and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for Supplemental Security Income should be granted.

**IT IS THEREFORE ORDERED THAT**:

1. The Commissioner's non-disability finding is vacated;

2. No finding is made as to whether Plaintiff Michael Kelley was under a "disability" within the meaning of the Social Security Act;

3. This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4. The case is terminated on the Court's docket.

March 9, 2018                                           *s/Sharon L. Ovington*
                                                        Sharon L. Ovington
                                                        United States Magistrate Judge